## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **DEIRDRE N. COSMANN** | ) | |
| **524 14th Street, SE, Unit 3** | ) | |
| **Washington, DC 20003** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No.** |
| | ) | |
| **BOOZ ALLEN HAMILTON, INC.** | ) | |
| **3232 Greensboro Drive** | ) | |
| **McLean, VA 22102** | ) | |
| **Defendant.** | ) | |
| | ) | |
| *Serve:* | ) | |
| **James J. Murphy, Esq.** | ) | |
| **Ogletree, Deakins, Nash,** | ) | |
| **Smoak & Stewart, P.C.** | ) | |
| **1909 K Street, N.W., Suite 1000** | ) | |
| **Washington, DC 20006** | ) | |
| *Counsel for Defendant* | ) | |
| | ) | |

---------------------------------------------------------_

## EMPLOYMENT DISCRIMINATION COMPLAINT AND
## <u>DEMAND FOR JURY TRIAL</u>

"If the client wants you there five days a week, it's five days a week and there's no accommodations." – *Scott Thigpen, Principal at Booz Allen, regarding Plaintiff's need for ad hoc telework as a disability accommodation.*

Plaintiff Deirdre N. Cosmann ("Plaintiff" or "Ms. Cosmann"), by and through her undersigned counsel, hereby brings this civil action against Booz Allen Hamilton Inc. ("Booz Allen" or the "Defendant") and alleges as follows:

### <u>Introduction and Summary</u>

1.  Plaintiff Deirdre N. Cosmann was a long time, high performing employee of Booz Allen who was terminated because Booz Allen refused to provide her with episodic

1

telework as a reasonable accommodation for her disability, and because she complained about the same. Plaintiff could perform all of her work via computer and phone, and therefore could telework. Nonetheless, Booz Allen denied Plaintiff the telework benefits it gave to other employees; scrutinized her work; stereotyped her as being unable to perform her job due to her need for accommodations; removed her from a major contract despite protests from the client; and refused to give her new work, claiming that due to her need to telework a few days a month she could not do any jobs that were not listed as full time telework. When Booz Allen switched to full time telework due to the onset of the COVID-19 pandemic in early 2020, Booz Allen still did not relent, and denied Plaintiff the telework benefits it provided to all other employees. Booz Allen actively prevented Plaintiff from obtaining other projects. Booz Allen terminated Plaintiff at the very time in early 2020 when Booz Allen employees, as well as employees of many organizations across the region, were teleworking due to the COVID-19 pandemic, and Booz Allen had instituted a company-wide policy to not lay off employees until July 2020. Despite this, Booz Allen insisted that Ms. Cosmann (and only Ms. Cosmann) could not work at Booz Allen jobs due to her need to telework, and unceremoniously terminated her in the midst of the pandemic. Later, Booz Allen refused to hire her back. This lawsuit seeks relief for unlawful disability discrimination and retaliation in violation of the Americans with Disabilities Act as amended ("ADA") and the Virginia Values Act ("VVA").

## Jurisdiction and Venue

2.    This action is brought pursuant to the Americans with Disabilities Act as Amended ("ADA"), and the Virginia Values Act ("VVA").

3.   This Court has original jurisdiction over Counts I-V in this case pursuant to 28 U.S.C. §

1331, 42 U.S.C. § 12117(a) because this action arises under the laws of the United States.

4.   This Court has supplemental jurisdiction over Count VI of this Complaint, which arises

under the laws of Virginia, pursuant to 28 U.S.C. §1367(a), because the claims in Count

VI arise from a common set of operative facts with Counts I-V. The claims in Counts VI

are so related to the claims in the action within the original jurisdiction of this Court that

they form part of the same case or controversy.

5.   Venue lies in this Court pursuant to 28 U.S.C. Sec. 1391(b) because Plaintiff was

employed in, and the discriminatory employment actions challenged in this Complaint

took place in this District.

## Exhaustion of Administrative Remedies

6.   Plaintiff filed her Charge of Discrimination against Defendant with the Equal

Employment Opportunity Commission (EEOC) on January 15, 2021, and cross-filed it

with the Virginia Division of Human Rights.

7.   The EEOC issued Plaintiff the Notice of Right to File Suit on March 2, 2022, which was

received by Plaintiff on March 3, 2022. *See* Exh. 1 (EEOC Notice of Right to File Suit).

8.   This Complaint is being timely filed within the statute of limitations set forth by the

sequential binding tolling agreements entered into by the parties, which tolled the statute

of limitations to file this Complaint by August 15, 2022. *See* Exh. 2 (Tolling

Agreements).

9.   All statutory prerequisites for bringing this action have been timely satisfied.

**The Parties**

10.   Plaintiff Deirdre N. Cosmann is an adult resident of the District of Columbia. Booz Allen employed Ms. Cosmann from 2007 until 2020. Beginning in June 2019, Plaintiff worked for Defendant in Crystal City in Arlington, VA.

11.   Ms. Cosmann suffers from regular, chronic Migraines with aura and vertigo (hereinafter, "Migraines").

12.   Plaintiff was a covered employee of Defendant within the meaning of ADA at all times relevant herein.

13.   Plaintiff was a qualified individual with a disability under the ADA because she could perform all the essential functions of her job with or without reasonable accommodation.

14.   Defendant Booz Allen Hamilton that holds itself out as a consulting agency specializing in American management and information technology. Booz Allen is headquartered in McLean, Virginia, and regularly conducts business in Virginia, including in McLean, VA and Alexandria, VA. Defendant employs over 27,000 employees. In 2019, Defendant's reported revenue was $6.70 billion dollars. In 2020, Defendant's reported revenue was $7.46 billion dollars. Defendant is, and has been, a covered employer within the meaning of the ADA.

**FACTS**

**Ms. Cosmann's Background**

15.   Ms. Cosmann is an environmental and energy resilience management and policy expert with over 15 years in a high-stakes consulting context, and an extensive track record

4

directly interfacing with and shaping Department of Defense policies and programs at the federal, state, and local levels.

16.     Ms. Cosmann earned her Bachelor of Science in Environmental Science and Policy from Oklahoma State University and her Masters of Public Administration in Environmental Science and Policy from Columbia University.

17.     Ms. Cosmann was hired by Booz Allen in 2007 as an environmental sustainability and energy and security specialist working directly with the Air Force Office for the Assistant Secretary for Installations, Environment, & Energy.

18.     During her employment, Booz Allen promoted Ms. Cosmann, and repeatedly offered her positions on prestigious, high profile projects for important government clients. Booz Allen entrusted Ms. Cosmann to lead projects with some of Booz Allen's most significant clients, including but not limited to the Department of Defense, Air Force, Army, Navy, and Marine Corps.

19.     During Ms. Cosmann's tenure for Booz Allen, Booz Allen gave her raises and performance awards, as well as praise for her expertise, skills, and team work.

20.     The Booz Allen clients for which Ms. Cosmann regularly praised her work, expertise, skills, and team work. This included senior employees for high profile clients.

21.     During her time at Booz Allen, Ms. Cosmann contributed to publications in major journals in her field, and served as a member of important trade associations. Ms. Cosmann's publications and trade association involvement brought Booz Allen additional recognition and an enhanced reputation in the fields of environmental and energy resilience management and policy.

## The Policies that Govern Ms. Cosmann's Employment with Booz Allen

### Booz Allen's Obligations Under the ADA

22.   Booz Allen is required to follow the Americans with Disabilities Act as amended (ADA), 42 U.S.C. §§ 12101 *et. seq.,* which makes it unlawful to fire or refuse to hire employees due to their disabilities. ADA § 12112(a).

23.   Booz Allen is required to follow the ADA, which prohibits discriminating against employees with disabilities in the term, conditions, and/or privileges of their employment.  ADA § 12112(a).

24.   Booz Allen is required to follow the ADA, which prohibits Booz Allen from limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status due to their disability. ADA § 12112(b)(1).

25.   Booz Allen is required to follow the ADA, which prohibits Booz Allen from "participating in a contractual or other arrangement or relationship" that has the effect of subjecting Booz Allen's employees with disabilities to disability discrimination prohibited by the ADA. ADA § 12112(b)(2).

26.   Booz Allen is required to follow the ADA, which prohibits Booz Allen from "utilizing standards, criteria, or methods of administration" that have the effect of discrimination on the basis of disability. ADA § 12112(b)(3).

27.   Booz Allen is required to follow the ADA, which prohibits Booz Allen from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability." ADA § 12112(b)(4).

28.   Booz Allen is required to follow the ADA which requires employers to provide reasonable accommodations to employees with disabilities. ADA § 12112(b)(5).

29.   Booz Allen is required to follow the ADA which prohibits Booz Allen from discriminating against an employee because they engaged in the protected activity of requesting accommodations, and/or made complaints that Booz Allen was discriminating against them based on their disability. ADA § 12203.

30.   Booz Allen is required to follow the ADA, which requires that employers provide a "reassignment to a vacant position," as a reasonable accommodation for an employee who cannot perform the essential functions of their job due to a disability. See ADA § 12111(9)(B). This includes reassignment to a lower paying job.

31.   Booz Allen is required to follow the Virginia Values Act, which prohibits Booz Allen from discriminating against individuals with disabilities, including in hiring, and requires Booz Allen to provide reasonable accommodations to employees.

**Contracting Policies**

32.   Booz Allen's contracts with executive agencies of the Federal Government are governed by the Federal Procurement Policy, 41 U.S.C. §101, *et. seq.*  The Federal Procurement Policy "permit[s] telecommuting by employees of Federal Government contractors in the performance of contracts entered into with executive agencies." 41 U.S.C. 3306(f).

33.   The contracts Booz Allen has with executive agencies of the Federal Government ("federal contracts") are governed by the Federal Acquisition Regulation (FAR). The Federal Acquisition Regulation states that a federal "agency shall generally not discourage a contractor from allowing its employees to telecommute in the performance of Government contracts." FAR § 7.108.

34.   Booz Allen was required to abide by its Contract and Preliminary Work Statement with the Army, which did not prohibit telework.

35. Booz Allen is required to follow the Federal Government's regulations regarding federal contracts, 41 C.F.R. 50, *et seq.,* including those involving equal employment opportunity, 41 C.F.R. 60, *et seq.*, and not discriminating against employees with disabilities. 41 CFR Part 60-741.

### Booz Allen Internal Policies

36. Booz Allen promulgated an "Equal Employment Opportunity and Affirmative Action" policy, in which Booz Allen promises employees that it is "committed to providing a workplace that is free from discrimination" including based on disability, and promised that Booz Allen "will provide reasonable accommodations … as required by federal, state, local or international law, to enable them to perform the essential functions of their job."

37. Booz Allen promulgated an "Equal Employment Opportunity and Affirmative Action" policy, in which Booz Allen promises employees that "[a]ny allegations of discrimination will be investigated, and, if substantiated, appropriate disciplinary or remedial actions will be taken up to and including termination of employment."

38. Booz Allen promulgated a "Code of Business Ethics and Conduct" policy, in which Booz Allen promises that it "does not tolerate retaliation against anyone for raising a good-faith ethical or legal concern, or for cooperating with an investigation."

39. Booz Allen, via notices from its Accommodation Team, promises that "Booz Allen prohibits retaliation against any applicant or employee who requests an accommodation or workplace adjustment in good faith."

**Booz Allen COVID-19 Policies**

40.   In response to the COVID-19 pandemic, Booz Allen instituted a company-wide telework company beginning March 3, 2020 and lasting at least through December 2020.

41.   In response to the COVID-19 pandemic, Booz Allen instituted a policy that no employees would be laid off between April 1, 2020 and July 2020.

**Ms. Cosmann's Disability and Initial Reasonable Accommodations**

42.   In 2013, while employed with Booz Allen, Ms. Cosmann was diagnosed with chronic Migraines with aura and vertigo ("Migraines").

43.   When Ms. Cosmann experiences a Migraine, she encounters severe headaches, nausea, and pain.

44.   Ms. Cosmann experiences Migraine symptoms around six to eight days a month on average.

45.   When Ms. Cosmann has Migraine symptoms, her Migraines are exacerbated by environmental triggers such as loud noises, ambient noises, bright lighting, and movement from cars, trains, buses, and/or riding the Metro rail.

46.   Ms. Cosmann's physician advised her that if she felt a Migraine coming on, Ms. Cosmann should avoid environmental triggers. Ms. Cosmann's physician advised that it was most effective to avoid environmental triggers by working from home, where Ms. Cosmann could control noise and lighting, and avoid movement from commuting.

47.   Ms. Cosmann's work sites for Booz Allen from 2013 to 2020 were in a cubicle in an open floor plan. There were no walls or doors around Ms. Cosmann's workspace for Ms. Cosmann to keep out loud and/or ambient noise of colleagues speaking, phones ringing, footsteps and/or printers and fax machines. In her workspace, there was overhead, bright

fluorescent lighting. Ms. Cosmann could not turn off the light, nor could she adjust the lighting.

48. The Booz Allen Disability Accommodation & Workplace Adjustment Services Team (the "Accommodations Team") is the division of Booz Allen which reviews, processes, and makes decisions about employee requests for reasonable accommodations based on disabilities, and is vested with the authority by Booz Allen to approve and/or deny reasonable accommodation requests for employees.

49. Pursuant to Booz Allen policy, managers are supposed to provide the reasonable accommodations granted by the Accommodations Team, and are not authorized to reject or deny disability accommodations granted by the Accommodations Team without explicit authorization from the Accommodations Team.

50. Ms. Cosmann formally requested the reasonable accommodation of telework as needed due to Migraines (approximately six to eight days a month) from Booz Allen's Accommodations Team in 2013.

51. Booz Allen's Accommodations Team approved Ms. Cosmann's 2013 request for a reasonable accommodation to telework as needed due to Migraines (approximately six to eight days a month).

52. Under the reasonable accommodation granted by the Accommodations Team, Booz Allen allowed Ms. Cosmann to work from home as needed when she felt a Migraine coming on, which usually amounted to six to eight days of telework per month, sometimes less, based on the symptoms and frequency of symptoms Ms. Cosmann experienced that month.

53.   On the rare occasions when her Migraines became so severe that she could not work at all, Ms. Cosmann took sick leave and notified her appropriate supervisors.

54.   In 2016, Ms. Cosmann renewed her request for telework due to Migraines, and Booz Allen again granted the reasonable accommodation. Ms. Cosmann continued to telework *ad hoc* for her Migraines pursuant to the reasonable accommodation.

55.   Between 2013 and June 2019, while her telework accommodation was in place, Booz Allen promoted Ms. Cosmann, gave her raises, gave her positive performance reviews, and assigned her to new contracts for high profile clients. She also received praise from Booz Allen clients for her work.

56.   Ms. Cosmann was able to complete her work for Booz Allen while teleworking as needed, approximately six to eight days a month. Ms. Cosmann's performed her job responsibilities for Booz Allen via the computer and/or telephone. Ms. Cosmann job involved reviewing files on a computer, and drafting documents, and regularly communicating with colleagues and clients via email, phone, Skype and conference calls, all of which could be done via telework.

57.   Many of Ms. Cosmann's clients were located around the country. Booz Allen expected employees, including Ms. Cosmann, to communicate with clients outside of the D.C. metropolitan area via computer and/or phone.  All of this could be done while Ms. Cosmann teleworked.

## New Position with Army Contract at Booz Allen

58.   In June 2019, Booz Allen asked Ms. Cosmann to take on the position of Energy Project Coordinator in the Army Office of Energy Initiatives (the "Army Contract").

59.   The Army Contract position involved identifying aging critical infrastructure in Army installations around the country to modernize energy systems and to anticipate and mitigate increasing physical, natural, and cyber threats.

60.   The work site for the Army Contract was in an office building in Crystal City, VA (the "Office.") The Office had an open floor plan with cubicles, and overhead fluorescent lighting.

61.   The Army Contract was designated by the contract terms as an "on site" workplace, which was the Booz Allen terminology for a contract where employees' work stations would be at the client's work place, as opposed to in a Booz Allen facility.

62.   Due to workload and upcoming deadlines, Booz Allen asked Ms. Cosmann to transition to the Army Contract quickly in order to meet the client's needs.

### Booz Allen Management on the Army Contract

63.   Booz Allen appointed Sarah Miller Lorimer as the Job Manager for Ms. Cosmann on the Army Contract. Booz Allen vested the Job Manager with the authority to oversee Ms. Cosmann's day to day work on the Army Contract; to assign Ms. Cosmann work; to make recommendations about hiring and firing, including hiring or firing Ms. Cosmann; to approve and/or deny requests for sick and/or personal leave; to approve and/or deny schedule changes; to approve and/or deny Ms. Cosmann's time sheet and billable report sent to Booz Allen and the client; to make decisions regarding Ms. Cosmann's day to day work for Booz Allen; to review Ms. Cosmann's work performance; to provide feedback on Ms. Cosmann's performance reviews. Under Booz Allen policy, performance reviews were used to determine raises, bonuses and/or promotions.

64.   The Job Manager's supervisor was John Crunkilton, a Senior Associate and manager at Booz Allen. Manager Crunkilton had the authority to make decisions regarding the terms and conditions of Ms. Cosmann's work for Booz Allen, including assigning her work, removing her from a contract, and/or terminating her employment.

65.   Scott Thigpen was the Principal at Booz Allen that oversaw the entirety of the Army Contract for Booz Allen.

### Ms. Cosmann Requests Accommodations for the Army Contract Position

66.   After learning of her assignment to the Army Contract, Ms. Cosmann proactively reached out to her immediate manager on the new Army Contract, Job Manager Sarah Miller Lorimer, to notify the Job Manager that she got Migraines and would need to use telework as a reasonable accommodation when she got a Migraine,, which was a long standing reasonable accommodation approved by the Booz Allen Accommodations Team.

67.   In response, the Job Manager told Ms. Cosmann directly that it would be "bad optics" for the client to have an employee not physically present in the office.

68.   Based on the Job Manager's statement that the client might have issues with Ms. Cosmann teleworking, Ms. Cosmann decided to approach the client directly to find out if and what the concerns about her teleworking would be. Ms. Cosmann approached the Director of Project Execution for the Army Office of Energy Initiatives (the "Army Project Director"), with whom Ms. Cosmann had previously worked on a different contract for Booz Allen. Ms. Cosmann explained to the Army Project Director about her Migraines and her need for telework as a reasonable accommodation.

69.    In response, the Army Project Director told Ms. Cosmann that the team on the Army

Contract had multiple individuals who were allowed to telework consistently and even

individuals who teleworked full time from other cities. The Army Project Director told

Ms. Cosmann she personally utilized telework. The Army Project Director was very

sympathetic to Ms. Cosmann, and ensured Ms. Cosmann that she would be permitted to

telework as needed as a reasonable accommodation for her Migraines.

70.    Based on the information provided by the Army Project Director, Ms. Cosmann was

reassured that her need for telework would not actually be a problem for the client.

Accordingly, Ms. Cosmann moved forward with beginning her new position on the Army

Contract.

71.    Ms. Cosmann informed the Job Manager that she had spoken to the Army Project

Director who had assured her that it would not be problem for Ms. Cosmann to telework,

and that other members of the team teleworked regularly.

**Booz Allen Denied Ms. Cosmann Reasonable Accommodations**

72.    When Ms. Cosmann began working on the Army Contract, the Job Manager expressed

displeasure at Ms. Cosmann teleworking.

73.    Ms. Cosmann explained that the Army Project Director had confirmed that it was not a

problem. Ms. Cosmann also explained that she was able to perform her work while

teleworking, and that the telework was necessary for her Migraines. Ms. Cosmann told

the Job Manager politely that if she ever had a concern about Ms. Cosmann's

performance, Ms. Cosmann would be happy to address it with her.

74.    The Job Manager informed Ms. Cosmann that she would not be allowed to telework,

even due to Migraines. The Job Manager told Ms. Cosmann that if she was having a

Migraine Ms. Cosmann would need to use sick leave, even if Ms. Cosmann was able to perform her work duties from home.

75.   Ms. Cosmann enjoyed her work as an environmental and energy resilience management and policy expert. Ms. Cosmann did not wish to take leave instead of working, nor did she medically need to take leave or reduced hours, nor did she wish to work reduced hours, or contribute fewer hours than she knew she was capable of working.

76.   Booz Allen provided Ms. Cosmann with 14 hours of accrued leave per month, or approximately two days of leave per month. Booz Allen did not provide Ms. Cosmann with paid leave to cover six to eight days of leave per month.

77.   If Ms. Cosmann took leave every time she had the onset of a Migraine six to eight days a month, Ms. Cosmann would lose valuable work time on her projects, which included high profile and/or time sensitive projects. If Ms. Cosmann were to lose valuable work time on such projects, this would likely cause her to receive poor performance reviews, and impact her professional reputation and/or the promotions, bonuses, and/or raises she could receive from Booz Allen.

78.   Ms. Cosmann asked the Job Manager to reconsider and allow her to telework when she had a Migraine onset. The Job Manager refused.

79.   Per the Job Manager's decision, Ms. Cosmann was required to go into her worksite for Booz Allen on days when she was suffering from her Migraines, or was forced to take sick leave instead of working from home.

80.   As a direct result of The Job Manager's decision, Ms. Cosmann experienced an exacerbation in the intensity and frequency of her Migraines.

## Ms. Cosmann Formally Re-Requests a Reasonable Accommodation

81.   Because The Job Manager would not permit Ms. Cosmann to utilize her already in place, reasonable accommodation, Ms. Cosmann re-requested a reasonable accommodation from the Booz Allen Accommodations Team.

82.   On July 16, 2019, Ms. Cosmann submitted a renewed reasonable accommodation request to the Booz Allen Accommodation Team. Her request included a medical note from her physician outlining the recommendation for an accommodation due to her Migraines.

83.   The Booz Allen Accommodations Team did not respond to Ms. Cosmann's July 16, 2019 request.

84.   Ms. Cosmann continued to follow up with the Accommodation Team for a response to her renewed reasonable accommodation request.

85.   On October 9, 2019, the Accommodation Team informed Ms. Cosmann that it had "inadvertently" closed her case, but had not notified her of such status despite her many attempts to follow up.

86.   Beginning on or around October 9, 2019, the Accommodations Team began to correspond with the Job Manager about Ms. Cosmann's accommodations.

87.   The Accommodation Team's failure to promptly respond to Ms. Cosmann's reasonable accommodation request further enabled the Job Manager to continue refusing to let Ms. Cosmann telework, despite the fact that Ms. Cosmann and Booz Allen were on notice of her disability and need for reasonable accommodations.

**<u>Retaliation and Continued Accommodation Denials</u>**

88.   After Ms. Cosmann submitted her July 2019 reasonable accommodation request to the

Booz Allen Accommodations Team, the Job Manager's mistreatment of Ms. Cosmann

escalated. Once the Accommodations Team began working actively with the Job

Manager on the accommodation, the Job Manager's mistreatment of Ms. Cosmann got

even worse.

89.   Ms. Cosmann continued to submit requests to the Job Manager to telework on specific

days when she felt the onset of a Migraine.

90.   The Job Manager repeatedly denied Ms. Cosmann's requests to telework, stating that she

believed she "needed" Ms. Cosmann to be present in the office. However, on these days

Ms. Cosmann could have performed all of her work for the day from home teleworking,

and did not need to be present in the office.

91.   The Job Manager expressed the sentiment that when employees are teleworking, they are

not truly working.

92.   The Job Manager began berating Ms. Cosmann in front of her colleagues and clients. The

Job Manager began deliberately interrupting Ms. Cosmann while she was on professional

calls with colleagues and clients. All of this was professionally embarrassing to Ms.

Cosmann and interfered with her ability to accomplish the purpose of the calls. Ms.

Cosmann complained about this to Booz Allen management, but Booz Allen

management did not intervene.

93.   On the few days that Ms. Cosmann was permitted to telework, the Job Manager

micromanaged Ms. Cosmann. The Job Manager required Ms. Cosmann to submit minute-

by-minute activity logs. Further, The Job Manager scrutinized Ms. Cosmann's time cards

and billing entries, alleging that Ms. Cosmann couldn't or shouldn't have spent certain amounts of time on specific projects. This was not based on any founded suspicion that Ms. Cosmann had not performed the work that she had recorded.  The Job Manager would refuse to process Ms. Cosmann's time cards with the time she submitted. Ms. Cosmann tried to make the changes the Job Manager demanded to allow for her time card to be submitted. In some instances, Ms. Cosmann gave up on convincing the Job Manager that she had worked the hours she said she worked, and instead agreed to convert portions of her time card to be classified as Paid Time Off (PTO).

94.   The Job Manager did not similarly micromanage other employees who had not requested reasonable accommodations, including other employees who teleworked.

95.   During her nearly thirteen years working for Booz Allen, Ms. Cosmann had not had her time cards or billing entries scrutinized in this manner. In Ms. Cosmann's nearly thirteen years working for Booz Allen, she had never had to reclassify time spent working on a project as Paid Time Off.

96.   Instead of granting the accommodation, the Accommodations Team continued to insist that Ms. Cosmann further justify her accommodation, such as documenting the specific days she had teleworked for Migraines in the previous months. On October 16, 2019 the Accommodations Team informed Ms. Cosmann that the Job Manager and Manager Crunkilton would only support a telework accommodation for two to three days a month, not the six to eight Ms. Cosmann required, supported by medical documentation. Only being permitted to telework two to three days a week would not be an effective accommodation for Ms. Cosmann. There was no justification for limiting Ms. Cosmann to two to three days a month of telework.

97.    On October 21, 2019, the Accommodations Team finally provided a tentative draft of the formal Booz Allen Accommodations Memo providing for telework. Ms. Cosmann pleaded with the Accommodations Team to work quickly to put a formal accommodation in place because the Job Manager was continuing to scrutinize her. The Accommodations Team did not take prompt action.

### Ms. Cosmann Escalates Complaints

98.    On November 13, 2019, Ms. Cosmann contacted Manager Crunkilton to ask that he intervene regarding the Job Manager's treatment of her. Manager Crunkilton did not intervene.

99.    On November 14, 2019, Ms. Cosmann contacted the Accommodations Team and explained that she was still being denied reasonable accommodations, that the Job Manager's mistreatment of her was escalating, that she believed she was being subjected to a hostile work environment, and that this was causing her Migraine symptoms to worsen.

100.   On the same day, November 14, 2019, a representative from Booz Allen Employee Relations reached out to Ms. Cosmann to notify her that her complaints had come the company's attention and that Employee Relations wanted to discuss her complaints. Employee Relations is the division of Booz Allen which support the investigations process involving internal policies and allegations of employee misconduct, including discrimination and harassment, as well as other laws that could require disclosures to the Federal Government or third party. Employee Relations told Ms. Cosmann that it would initiate an investigation.

**Booz Allen Refuses to Honor the Reasonable Accommodations**
**Booz Allen Formally Approved and Retaliates**

101. On November 21, 2019, the Booz Allen Accommodation Team formally approved Ms. Cosmann's request for reasonable accommodations, over four months after she initially submitted it for the Army Contract job, and a full month after providing her with the tentative draft memo. There was no justification for this delay.

102. At the end of the Accommodations Memo, Booz Allen wrote "Booz Allen prohibits retaliation against any applicant or employee who requests an accommodation or workplace adjustment in good faith." Booz Allen did not live up to this promise.

103. Even after Booz Allen officially approved Ms. Cosmann's telework accommodation, the Job Manager continued to refuse to allow Ms. Cosmann to telework.

104. Even after Booz Allen officially approved Ms. Cosmann's telework accommodation, the Job Manager continued to mistreat Ms. Cosmann, including berating Ms. Cosmann in front of colleagues, and scrutinizing Ms. Cosmann's time cards and billing entries.

105. On December 2, 2019, Ms. Cosmann reached out to Booz Allen's Human Resources and the Booz Allen Accommodations Team to raise her concerns with the Job Manager's continued denial of her accommodations, mistreatment of her, and scrutiny of her time cards. Neither Human Resources nor the Accommodations Team intervened.

106. The Job Manager's mistreatment of Ms. Cosmann continued to worsen.

**Booz Allen Removes Ms. Cosmann From Her Work Project**

107. On or around December 5, 2019, Ms. Cosmann met with Manager Crunkilton to raise her concerns about the Job Manager's treatment of her. In this meeting, Manager Crunkilton told Ms. Cosmann that there were concerns that she had not been reporting her work in a

timely manner. Ms. Cosmann explained that she had been reporting her work in a timely manner, but the Job Manager has been holding up her time card approval and scrutinizing her time cards, and this created delays. Ms. Cosmann complained that there was no provision in the reasonable accommodation that the Job Manager scrutinize her time cards for time spent teleworking, but the Job Manager was doing so anyway. Ms. Cosmann complained to Manager Crunkilton that she felt that the delays in formally approving her reasonable accommodation had not helped her workplace situation, but she was concerned that ever since it was formally approved, she had seen no improvement in the Job Manager's treatment of her. Ms. Cosmann complained that the Job Manager applied double standards to her team, scrutinizing Ms. Cosmann's work, especially while teleworking, while not doing so to other members of the team. Ms. Cosmann complained that the Job Manager was holding up Ms. Cosmann's time cards and questioning the veracity of what Ms. Cosmann wrote on her time cards, which Ms. Cosmann saw as a serious attack on her professional integrity.

108.   Manager Crunkilton asked Ms. Cosmann what she wished for him to do. Ms. Cosmann responded with words to the effect of "what can I do? Despite the accommodation, [Job Manager] Sarah [Lorimer] is retaliating against me, and I can't handle it anymore."  In response, Manager Crunkilton said he thought it would be best if Ms. Cosmann transitioned off the project.

109.   In short, rather than finding a way for Ms. Cosmann's accommodations to be honored, and correct the Job Manager's mistreatment of Ms. Cosmann, Manager Crunkilton told Ms. Cosmann that the best line of action would be to remove her from the project.

110.    Ms. Cosmann expressed concern to Manager Crunkilton that if she was taken off a

project, she would not have billable work, and could be terminated if she did not have

work. Manager Crunkilton told Ms. Cosmann that Booz Allen would assign her to

another project in her field of environmental/energy management and policy.

111.    Ms. Cosmann expressed that if she was going to be transitioned off, she wanted it to be a

smooth transition, so that she would have time to complete projects and not leave her

colleagues in a lurch. Manager Crunkilton said he would discuss and let her know.

112.    Ms. Cosmann did not wish to be removed from her project for Booz Allen. Her

preference was that Booz Allen correct the situation and stop the mistreatment the Job

Manager was subjecting her to, and for Booz Allen enforce the reasonable

accommodation it had formally granted.  However, she saw that Manager Crunkilton was

leaving her with no choice. Ms. Cosmann relied on the representation from Manager

Crunkilton that Booz Allen would place her in a new position. During her nearly thirteen

years working for Booz Allen she had held many positions, and had seen many other

employees rotate through many contracts. She was aware of other contracts Booz Allen

had related to energy and/or environmental matters, and believed she would quickly be

able to find another Booz Allen contract to work on in her field.

113.    Later that day, Manager Crunkilton sent Ms. Cosmann an email stating "Per our

discussion on December 5th, I understand that you are wanting to transition from

supporting the Army Office of Energy Initiatives due to medical conditions that prevent

you from being able to effectively accomplish the prescribed work and support the team."

This was inaccurate. Ms. Cosmann had not requested to be transitioned form the team,

nor did she believe that her medical conditions prevented her from being able to

effectively accomplish her work or support her team. Booz Allen's position contradicted what Ms. Cosmann had told in Booz Allen in her numerous discussions about reasonable accommodations: that Ms. Cosmann wanted to do her work, and that she could do her work with accommodations for her medical conditions. There was no reason for Ms. Cosmann to change her mind about her ability to work just two weeks after she finally received her long sought formal reasonable accommodations. The email from Manager Crunkilton is direct evidence of discrimination and improper stereotyping of Ms. Cosmann due to her disability.

114.    Booz Allen's December 5, 2019 announcement to remove Ms. Cosmann from the contract came exactly two weeks after Booz Allen had finally formally approved Ms. Cosmann's reasonable accommodations on November 21, 2019, after four months of denying these same accommodations.

115.    On Monday, December 9, 2019, Manager Crunkilton and the Job Manager held a transition meeting with Ms. Cosmann. They informed Ms. Cosmann that she would be removed from the project by the end of the week.

116.    Ms. Cosmann was surprised by Booz Allen's decision to abruptly end her contract. Three days was not the standard time Booz Allen allowed employees to have when transitioning off a project. Ms. Cosmann worried that such an abrupt departure would damage her professional reputation with her clients, as she was unable to properly notify and wrap up her responsibilities.

117.    Ms. Cosmann informed Booz Allen about her concerns about abruptly transitioning off a project, and asked for additional time. Booz Allen denied this request.

118. Ms. Cosmann spoke to her clients on the Army Contract to notify them that she was transitioning off. They expressed disappointment that she was leaving, and even requested that she be able to stay longer to complete projects, especially given the upcoming deadlines on the projects. Booz Allen rejected this request from the client.

119. Booz Allen replaced Ms. Cosmann's role on the Army Contract with a junior employee who recently graduated from college with limited or no experience in energy policy. Upon information and belief, the replacement did not have a disability, nor had he engaged in any prior protected activity.

120. Army employees expressed displeasure that Booz Allen was replacing Ms. Cosmann, who had over thirteen years of energy policy experience, with a junior employee with virtually no energy policy experience, especially at such an important juncture in the big project.

121. Despite the client's protests, Booz Allen removed Ms. Cosmann from the Army Contract, effective December 13, 2019.

122. On December 18, 2019, Employee Relations contacted Ms. Cosmann about the results of their investigation regarding a hostile work environment created by The Job Manager. Ms. Cosmann informed Employee Relations that she had since been removed from the Army Contract, and raised concerns about discrimination and Booz Allen misrepresenting the terms of her departure.  Employee Relations said there was nothing they could do because the Employee Relations investigation had concluded, but that Employee Relations would follow up with Human Resources. Ms. Cosmann heard nothing further from Employee Relations, nor was any corrective action taken.

## **Booz Allen Refuses to Give Ms. Cosmann New Work**

123.    Under Booz Allen policies, employees who are taken off a project/contract have a limited

amount of time to find a new contract/project with billable work. Employees who have

no billable work for an extended period of time are given the status of "unbillable" and

receive a "Lack of Work" letter from Booz Allen. The Lack of Work letter is Booz

Allen's formal notice that an employee will be terminated if they do not have or find any

billable projects to work on within the time frame set by the Lack of Work letter.

124.    After Booz Allen removed her from her contract, Ms. Cosmann began to diligently look

for and apply to new projects with Booz Allen, as well as networking within Booz Allen

to find new positions.

125.    Ms. Cosmann further worked to find potential new projects in tandem with her Booz

Allen Principal Scott Thigpen, and Rachel Guardo-Lopez, the Human Resources Talent

Consultant that Booz Allen assigned to work with her.

126.    At the time, Booz Allen had numerous projects open with clients and/or subject matter

with which Ms. Cosmann had worked before. Ms. Cosmann was qualified for these

positions.

127.    At the time, Booz Allen had other open positions in fields related to Ms. Cosmann's

expertise. Ms. Cosmann was qualified for these positions.

128.    At the time, Booz Allen had vacancies for positions in Ms. Cosmann's areas of expertise

that were seeking an employee who billed at a lower rate than Ms. Cosmann (*i.e.* a more

junior/lower grade employee). Ms. Cosmann could have performed these positions, and

was qualified for them.

129.   Ms. Cosmann reached out to managers regarding their posted vacant positions. In Ms. Cosmann's discussions with the managers, it appeared that they were interested in hiring Ms. Cosmann for their projects. However, after Principal Thigpen reached out to the managers, suddenly the managers were no longer interested in Ms. Cosmann as a candidate. It appeared that Principal Thigpen, or someone else in Booz Allen, had said something to these managers about Ms. Cosmann's disability, accommodation needs, and/or complaints that discouraged the managers from hiring her. Ms. Cosmann saw these positions continue to be listed as vacant and unfilled.

### Booz Allen Shifts to Telework Due to COVID-19

130.   While Ms. Cosmann continued to search for and apply to various projects, in or around late February/early March 2020 the COVID-19 Pandemic reached the Northern Virginia/ Washington, D.C. region.

131.   Booz Allen informed all employees that, effective March 3, 2020, all employees would be required to telework full time and that no employees were to work onsite without prior clearance.

132.   According to Booz Allen, "[b]y March 2020, approximately 90 percent of our more than 27,000 employees served clients by teleworking." *See* Booz Allen's Approach To COVID-19, Spring/Summer 2020. *Available at*
*https://www.boozallen.com/content/dam/boozallen_site/esg/pdf/covid/covid-19-our-approach-to-safety-business-continuity.pdf*  (last accessed Aug. 14, 2022).

133.   In addition to Booz Allen, numerous other employers in and around the Northern Virginia region instituted all-telework policies to avoid the spread of the highly contagious COVID-19 virus.

134.    On March 15, 2020, the U.S. Office of Management and Budget (OMB), issued a
        Memorandum for the Heads of Departments and Agencies, M-20-15, with the subject
        "Updated Guidance for the National Capital Region on Telework Flexibilities in
        Response to Coronavirus." *Available at* https://www.whitehouse.gov/wp-
        content/uploads/2020/03/M20-15-Telework-Guidance-OMB.pdf  (last accessed Aug. 14,
        2022). In this Memorandum, OPM stated that Federal agencies within the National
        Capital Region (NCR) are "asked to offer maximum telework flexibilities to all current
        telework eligible employees" and that OPM "encourage[d] agencies to use all existing
        authorities to offer telework to additional employees, to the extent their work could be
        telework enabled."

135.    The National Capital Region includes Northern Virginia, Washington D.C., and parts of
        Maryland. Ms. Cosmann's position on the Army Contract was in the National Capital
        Region. In addition, Booz Allen had listed vacancies for which Ms. Cosmann was
        qualified in the National Capital Region. This meant that these agencies had by and large
        gone fully to telework.

136.    On March 20, 2020, OPM issued a Memorandum for the Heads of Departments and
        Agencies, M-20-18, with the subject Managing Federal Contract Performance Issues
        Associated with the Novel Coronavirus (COVID-19), *available at*
        https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-18.pdf. (last accessed
        Aug. 14, 2022). The Memorandum stated that "Agencies are urged to work with their
        contractors, if they haven't already, to evaluate and maximize telework for contractor
        employees, wherever possible."

137.   On April 1, 2020, Booz Allen CEO held a virtual meeting for all Booz Allen employees. In this meeting, the CEO announced that Booz Allen had decided not to lay off or reduce work hours for any Booz Allen employees until at least July 1, 2020.

### Booz Allen Notifies Ms. Cosmann That She Will be Terminated, And Continues to Deny Reasonable Accommodations

138.   In light of Booz Allen's March 3, 2020 all-telework policy, Ms. Cosmann once again requested to be considered for vacant positions for which Booz Allen told her she could not apply due to her need to telework, or if she could return to her prior position given that everyone was teleworking.

139.   Booz Allen denied Ms. Cosmann's request again on the basis that the telework policy was only for those who currently had billable work.

140.   On March 23, 2020, Ms. Cosmann had a phone call with Principal Thigpen and Human Resources. In the discussion, they informed Ms. Cosmann that she would be issued a Lack of Work Letter. Ms. Cosmann asked again about the opportunity to be assigned to a project now that Booz Allen was under full time telework. Booz Allen refused.

141.   Later that day, on March 23, 2020, Booz Allen sent Ms. Cosmann a Lack of Work Letter stating that "[a]s a follow up to our discussion today, due to lack of full time billable work, we are terminating your employment."

142.   The Letter stated that Ms. Cosmann would be placed in a termination notification period from March 24, 2020 until April 21, 2020, at which point she would be terminated if she had not found new billable work. However, if Ms. Cosmann found work during this notification period, the Lack of Work Letter would be rescinded.

**Scott Thigpen, Principal at Booz Allen, States that Booz Allen Will Not Accommodate Ms. Cosmann**

143.   Ms. Cosmann continued to work with Principal Thigpen and Human Resources, as instructed by Booz Allen, to find billable work.

144.   Ms. Cosmann regularly met with Principal Thigpen and Human Resources to try and find billable work.

145.   In these calls, Principal Thigpen and/or Human Resources would tell Ms. Cosmann that she was not eligible for the jobs she identified, because the jobs were listed as working "on site." At Booz Allen, on some government contracts employees' primary duty station was in a Booz Allen office, and they would perform the work remotely from the Booz Allen office for a government agency. Other contracts were designated as "on site," a term that mean that the Booz Allen employees' primary duty station was located on site at a government facility. Principal Thigpen and/or Human Resources told Ms. Cosmann that because she required telework for her disability, Ms. Cosmann was precluded from working for on site projects.

146.   In April 2020, Ms. Cosmann had a call with Principal Thigpen. In it she asked whether the CEO's April 1, 2020 announcement that no Booz Allen would be terminated before July 2020 applied to her. Principal Thigpen responded that he believed it did not, but he would confirm.

147.   In regards to Ms. Cosmann finding a new billable position, Principal Thigpen stated that "[s]ometimes they're price point issues," meaning that sometimes a client would not want to hire Ms. Cosmann for a vacancy because they were seeking a more junior employee who charged a lower billable rate than the rate Booz Allen set for Ms. Cosmann.

148.    Principal Thigpen stated that "if the job is listed as on site, it's an on site -- you know, the long term is, it's got to be -- you know, it's got to be somebody that's willing and able to go on site, over the long term, in a location."

149.    The jobs Principal Thigpen was referencing, and that Ms. Cosmann was applying for, were contracts with federal agencies.

150.    Ms. Cosmann replied that she believed there might be "a misunderstanding" on "the accommodation front." She stated that "[t]he accommodation never was intended for full-time telework. It was only as needed per the documented medical condition."

151.    Ms. Cosmann stated that "none of us know how long [COVID-19] is going to go on for" and that "in the interim" it was "going to be a very slow rollback onto job sites." She then told Principal Thigpen that she was "confused" as to why she "wouldn't get the chance" to work on a project listed as on site while teleworking due to COVID-19 was in place.

152.    In response, Principal Thigpen told Ms. Cosmann that she "need[ed] to represent to [hiring managers] what you can and can't do and let them make the decision about whether that's going to work for the client. Because that's ultimately the decision point."

153.    Principal Thigpen stated "[i]f the client wants you there five days a week, it's five days a week and there's no -- there's no accommodations."

154.    Afterwards, Principal Thigpen and Ms. Cosmann continued to discuss potential vacant positions on government contracts.

155.    Afterwards, in April 2020, Ms. Cosmann had a call with Principal Thigpen and Human Resources. In the call, Ms. Cosmann followed up on her question regarding if the CEO's April 1, 2020 announcement that no Booz Allen would be terminated before July 2020 applied to her. Principal Thigpen responded that it did not apply to Ms. Cosmann.

156.  Ms. Cosmann told Principal Thigpen and Human Resources that "it sounds like there is a misinterpretation of my accommodation." She clarified that her accommodation was "telework when needed" and that "it seems like my situation was interpreted as requirement 100 percent." She stated that she "wanted to clarify that that was not ever part of the accommodation. It was telework as needed, due to documented medical conditions."

157.  Principal Thigpen asked Ms. Cosmann "who was interpreting it that way?" Ms. Cosmann responded "it sounds like you have been, Scott, because you keep on telling me that, "Well, this on site. This is on site." And stated that she was wondering if "that has been the roadblock" to finding a billable position "if it's the assumption that needed 100 percent telework" because "that was never part of the accommodations."

158.  Principal Thigpen responded "the way I characterized it is you do have [a condition] that would prevent you from being 100 percent on site, you know, all the time" and that "what we're talking about is you can't commit to that" [*i.e.,* being 100 percent on site].

159.  Ms. Cosmann reminded Principal Thigpen that "[i]n the current climate… [e]verybody's 100 percent off site" and that she was "[c]onfused about what standard is being applied" to her.

160.  Principal Thigpen responded that it is "what is dictated by the contract" and that "if we got you started on a contract and it says it's a 100 percent on site position, even though, yes, everybody's in temporary telework, that provision still holds."

161.  Principal Thigpen stated that he could not place Ms. Cosmann on a contract that "says it's a 100 percent on site position" when while everyone was teleworking due to COVID-19, because if in the future if the COVID-19 restrictions were lifted and in-person work

31

resumed, having Ms. Cosmann on the contract "would not be a workable solution" if the client "wanted 100 percent onsite."

162.  Ms. Cosmann asked Principal Thigpen whether this would apply "even if [the accommodation] was only telework, as needed." Principal Thigpen responded that "that's up to the people that are the job managers. I can't interpret what's in every contract."

163.  Booz Allen had government contracts with vacancies that Ms. Cosmann was qualified for. Pursuant to 41 U.S.C. 3306(f), government contracts "shall permit telecommuting by employees of Federal Government contractors in the performance of contracts entered into with executive agencies." Pursuant to Federal Acquisition Regulation 7.108, a government agency "shall generally not discourage a contractor from allowing its employees to telecommute in the performance of Government contracts."

164.  In the call, Ms. Cosmann notified Human Resources and Principal Thigpen that she had an interview for a position but "they needed a more junior person," so she was not selected.

165.  Ms. Cosmann continued to look for work at Booz Allen. On Sunday, April 19, 2020, Ms. Cosmann emailed Human Resources asking for "a short-term extension" for the Lack of Work Letter, stating that she was "tracking down multiple leads but not sure that they will come to fruition by Tuesday [April 21, 2020]."

166.  Booz Allen Human Resources responded that "we do not provide extensions" for a Lack of Work Letter.

167.  On April 21, 2020, Booz Allen's decision to terminate Ms. Cosmann went into effect. Effective April 22, 2020, Ms. Cosmann lost her employee status with Booz Allen, along with her income and benefits.

168.   On April 21, 2020, Booz Allen's mandatory telework policy was still in effect, as was Booz Allen's stated policy to not lay off employees until July 2020.

169.   Booz Allen terminated Ms. Cosmann because of her disability, and its continued refusal to provide her with accommodations.

**Booz Allen Refuses to Rehire Ms. Cosmann**

170.   On December 31, 2020, Ms. Cosmann reached out to Booz Allen and requested to be rehired to an appropriate position within the company.

171.   Ms. Cosmann told Booz Allen that all jobs, including her former position, had successfully transitioned to fully remote during COVID-19, and that her reasonable accommodations could no longer suffice as a reason to deny her equal employment opportunities.

172.   Booz Allen rejected Ms. Cosmann's request to be rehired.

**Continued Impact of Booz Allen's Discrimination and Retaliation**

173.   Booz Allen's discrimination and retaliatory termination has inflicted enormous financial, reputational, person, and emotional harm to Ms. Cosmann.

**STATEMENT OF CLAIMS:**

**COUNT I.**          **Discrimination Due to Disability in Violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et. seq.***

174.   Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

175.   Plaintiff suffers from physical impairments (Migraines) that substantially limit one or more of her major life activities, including working. Therefore, Plaintiff has a disability under the ADA.

176.   During her employment with Defendant, Plaintiff was a qualified person with a disability in that she could perform the essential functions of her job with or without reasonable accommodations.

177.   Defendant,  by and through its agents, officials and/or employees, unlawfully discriminated against Plaintiff because of her disability, in violation of 42 U.S.C. § 12101 *et seq.*, by, among other ways: Denying her the telework benefits afforded to other employees; Denying her the telework benefits to which she was entitled pursuant to the federal contract on which she worked for Defendant; Scrutinizing her time cards and work product in a manner not done to other employees, nor warranted by a legitimate nondiscriminatory business reason; Finding unwarranted fault with her job performance and attendance for no legitimate reason; Stereotyping Plaintiff as unable to perform her job duties due to her disability and/or reasonable accommodation needs; Showing Plaintiff hostility; Removing Plaintiff from her work project; Replacing her with a less qualified, less experienced person without a disability; Denying her job opportunities; Interfering with her ability to find new work projects; Denying Plaintiff the benefit of the Defendant's March 2020 COVID-19 telework policy once it was established; Denying Plaintiff the benefit of Defendant's policy to not terminate employees between April 1 2020 and July 2020.

178.   Defendant terminated Plaintiff's employment in violation of the ADA. 42 U.S.C. § 12101 *et. seq.*

179.   Defendant's statements to Plaintiff about why she was being subjected to the disparate treatment detailed herein constitute direct evidence of discrimination based on her disability.

180.   Defendant's statements to Plaintiff about why she was being terminated constitute direct evidence of discrimination based on her disability.

181.   Plaintiff was injured and negatively affected because of this discriminatory work environment and her discriminatory termination.

182.   Plaintiff's treatment that was different and discriminatory when compared to that of Defendant's similarly-situated, non-disabled employees.

183.   The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's federally protected civil rights.

184.   Many years ago, the ADA outlawed illegal discrimination based on disability. Employers of the size, reputation, and expertise of this Defendant should have prevented this situation or should have promptly remedied it.

185.   As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, benefits and entitlements; medical damages; damage to her career and reputation; personal humiliation; mental anguish; and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory, consequential and punitive damages against Defendant.

186.   Plaintiff has incurred costs and has had to engage the services of attorneys to pursue this matter and she is entitled to recover her attorneys' fees and costs.

**COUNT II.        Failure to Provide Reasonable Accommodation for Plaintiff's Disability in Violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et. seq.***

187.    Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

188.    Plaintiff suffers from physical impairments (Migraines) that substantially limit one or more of her major life activities, including working. Therefore, Plaintiff has a disability under the ADA.

189.    During her employment with Defendant, Plaintiff was a qualified person with a disability in that she could perform the essential functions of her job with or without reasonable accommodations.

190.    Defendant had notice of Plaintiff's disability beginning in 2013 when she requested reasonable accommodations for her disability, which Defendant granted, and Defendant remained on notice. Defendant was again put on notice of Plaintiff's disability and need for accommodations when Plaintiff notified her Job Manager, Sarah Miller Lorimer, about disability and accommodation needs in June 2019. Defendant received numerous continuous notice about Plaintiff's disability and reasonable accommodation needs from June 2019 through the end of her employment due to Plaintiff providing such notice, including notice to managers and a Principal for Defendant; notice to Human Resources, and notice to Defendant's designated Reasonable Accommodations Team.

191.    Plaintiff required the reasonable accommodation of *ad hoc* telework approximately six to eight days a month as needed due to her Migraines.

192.    Plaintiff could perform all the essential functions of her position for Defendant with the reasonable accommodation of *ad hoc* telework, including because her work was based on

the computer and phone; her colleagues regularly teleworked; there were no security or other requirements of her project to prohibit teleworking; the client she worked for permitted telework on the project; the federal government prohibits entering into contracts such as the one Defendant had for Plaintiff's project, that prohibit telework.

193.   Defendant repeatedly denied Plaintiff's reasonable accommodation request for *ad hoc* telework from June 2019 onwards.

194.   None of accommodations Plaintiff requested from Defendant constituted an undue burden for Defendant.

195.   Defendant formally re-approved Plaintiff's reasonable accommodation request for *ad hoc* telework on November 21, 2019, four months after Plaintiff made the request. This was an unreasonable delay for approving such accommodations, and during these four months Defendant caused Plaintiff to suffer without effective accommodations in violation of the ADA.

196.   After Defendant formally re-approved Plaintiff's reasonable accommodation request for *ad hoc* telework on November 21, 2019, Defendant, through its managers, agents, and/or employees, continued to deny Plaintiff the ability to telework as a reasonable accommodation.

197.   Defendant continued to deny Plaintiff's reasonable accommodation request for telework even after Defendant shifted to company-wide telework due to the onset of the COVID-19 pandemic.

198.   Defendant denied Plaintiff's request for a modest extension of time to find a new work project within the company in order to keep her employment.

199. The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's federally protected civil rights.

200. Many years ago, the ADA required employers such as Defendant to provide reasonable accommodations for individuals with disabilities. Employers of the size, reputation, and expertise of this Defendant should have prevented this situation or should have promptly remedied it.

201. As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, benefits and entitlements; medical damages; damage to her career and reputation; personal humiliation; mental anguish; and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory, consequential and punitive damages against Defendant.

202. Plaintiff has incurred costs and has had to engage the services of attorneys to pursue this matter and she is entitled to recover her attorneys' fees and costs.

**COUNT III.      Failure to Provide Reasonable Accommodation of Reassignment to Vacant Position for Disability in Violation of the Americans with Disabilities Act (ADA) 42 U.S.C. §§ 12101 *et. seq.***

203. Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

204. Plaintiff suffers from physical impairments (Migraines) that substantially limit one or more of her major life activities, including working. Therefore, Plaintiff has a disability under the ADA.

205. During her employment with Defendant, Plaintiff was a qualified person with a disability in that she could perform the essential functions of her job with or without reasonable accommodations.

206.    Under the ADA, even if, *arguendo,* Plaintiff could not have performed the essential functions of the position on the Army Contract that she held (which she could have done), Defendant had an obligation to reassign her to a vacant position that she could perform with the reasonable accommodations she required. If there are no comparable positions available, Defendant has an obligation under the ADA to provide the reasonable accommodation of last resort of reassigning Plaintiff to another vacant funded position even if it is lower paying.

207.    Prior to Plaintiff's termination, there were vacant, funded positions that Plaintiff was qualified for, including lower paying positions. Defendant was on notice that there were such positions. Defendant failed to reassign her to such positions.

208.    Defendant's statements to Plaintiff that there were vacant, funded, lower paying positions detailed herein constitute direct evidence of a failure to provide her a reasonable accommodation of reassignment in violation of the ADA.

209.    The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's federally protected civil rights.

210.    Many years ago, the ADA required employers such as Defendant to provide reasonable accommodations for individuals with disabilities. Employers of the size, reputation, and expertise of this Defendant should have prevented this situation or should have promptly remedied it.

211.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, benefits and entitlements; medical damages; damage to her career and reputation; personal humiliation; mental anguish; and embarrassment justifying an award including,

but not limited to, back pay, lost benefits, front pay, compensatory, consequential and punitive damages against Defendant.

212.   Plaintiff has incurred costs and has had to engage the services of attorneys to pursue this matter and she is entitled to recover her attorneys' fees and costs.

**COUNT IV.**       **Retaliation in Violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et. seq.***

213.   Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

214.   Plaintiff suffers from physical impairments (Migraines) that substantially limit one or more of her major life activities, including working. Therefore, Plaintiff has a disability under the ADA.

215.   During her employment with Defendant, Plaintiff was a qualified person with a disability in that she could perform the essential functions of her job with or without reasonable accommodations.

216.   Plaintiff engaged in protected conduct within the meaning of the ADA when she requested reasonable accommodations and questioned the denial of such accommodations to Defendant's management, Defendant's Human Resources, Defendant's Accommodations Team, and/or Defendant's Employee Relations department.

217.   After Plaintiff engaged in this protected conduct, Defendant's agents, officials and/or employees treated her differently than similarly situated non-disabled employees by: Denying her the telework benefits afforded to other employees; Denying her the telework benefits to which she was entitled pursuant to the federal contract on which she worked

for Defendant; Scrutinizing her time cards and work product in a manner not done to other employees, nor warranted by a legitimate nondiscriminatory business reason; Finding unwarranted fault with her job performance and attendance for no legitimate reason; Stereotyping Plaintiff as unable to perform her job duties due to her disability and/or reasonable accommodation needs; Showing Plaintiff hostility; Removing Plaintiff from her work project; Replacing her with a less qualified, less experienced person without a disability and/or who had not engaged in protected activity; Denying her job opportunities; Interfering with her ability to find new work projects; Denying Plaintiff the benefit of the Defendant's March 2020 COVID-19 telework policy once it was established; Denying Plaintiff the benefit of Defendant's policy to not terminate employees between April 1 2020 and July 2020; and terminating her employment. Defendant's mistreatment of Plaintiff escalated as she continued to engage in protected conduct.

218.    Defendant removed Plaintiff from her work project because of her disability just two weeks after Plaintiff obtained the end goal of her protected activity: her formal reasonable accommodation from Defendant.

219.    Plaintiff was injured and negatively affected because of this retaliatory treatment and retaliatory termination.

220.    The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's federally protected civil rights.

221.    Many years ago, the ADA outlawed illegal retaliation for engaging in protected activity under the ADA. Employers of the size, reputation, and expertise of this Defendant should have prevented this situation or should have promptly remedied it.

222.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, benefits and entitlements; medical damages; damage to her career and reputation; personal humiliation; mental anguish; and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory, consequential and punitive damages against Defendant.

223.    Plaintiff has incurred costs and has had to engage the services of attorneys to pursue this matter and she is entitled to recover her attorneys' fees and costs.

**COUNT V.        Failure to Rehire in Violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et. seq.***

224.    Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

225.    Plaintiff suffers from physical impairments (Migraines) that substantially limit one or more of her major life activities, including working. Therefore, Plaintiff has a disability under the ADA.

226.    During her employment with Defendant, and at the time she sought rehire, Plaintiff was a qualified person with a disability in that she could perform the essential functions of her job with or without reasonable accommodations.

227.    On December 31, 2020, Plaintiff requested to be rehired by Defendant, notifying Defendant that all of Defendant's jobs, including her former position, had successfully transitioned to fully remote during COVID-19, and that therefore Defendant's logic of denying her telework as a reasonable accommodation should be disregarded.

228.    Defendant denied Plaintiff's request.

229.   Plaintiff was injured and negatively affected because of this retaliatory treatment and retaliatory termination.

230.   The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's federally protected civil rights.

231.   As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, benefits and entitlements; medical damages; damage to her career and reputation; personal humiliation; mental anguish; and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory, consequential and punitive damages against Defendant.

232.   Plaintiff has incurred costs and has had to engage the services of attorneys to pursue this matter and she is entitled to recover her attorneys' fees and costs.

**COUNT VI.       Failure to Rehire in Violation of Virginia Values Act (VVA), Code of Virginia § 2.2-3905**

233.   Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

234.   Plaintiff suffers from physical impairments (Migraines) that substantially limit one or more of her major life activities, including working. Therefore, Plaintiff has a disability under the VVA.

235.   During her employment with Defendant, and at the time she sought rehire, Plaintiff was a qualified person with a disability in that she could perform the essential functions of her job with or without reasonable accommodations.

236.   On December 31, 2020, Plaintiff requested to be rehired by Defendant, notifying Defendant that all of Defendant's jobs, including her former position, had successfully

transitioned to fully remote during COVID-19, and that therefore Defendant's logic of denying her telework as a reasonable accommodation should be disregarded.

237.   Defendant denied Plaintiff's request.

238.   Plaintiff was injured and negatively affected because of this retaliatory treatment and retaliatory termination.

239.   The acts and omissions committed by Defendant were willful, malicious and in reckless disregard of Plaintiff's federally protected civil rights.

240.   As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, benefits and entitlements; medical damages; damage to her career and reputation; personal humiliation; mental anguish; and embarrassment justifying an award including, but not limited to, back pay, lost benefits, front pay, compensatory, consequential and punitive damages against Defendant.

241.   Plaintiff has incurred costs and has had to engage the services of attorneys to pursue this matter and she is entitled to recover her attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Deirdre N. Cosmann respectfully requests that this Court:

A.  Enter a Declaratory judgement that Defendant's conduct violated her rights;

B.  Order Defendant to award Plaintiff compensatory damages for the emotional harm and the decrease in the enjoyment of her life which she has suffered as a result of Defendant's unlawful actions in violation of her rights;

C.  Order Defendant to award Ms. Cosmann for economic harm in the form of  back pay and other lost economic benefits;

D.  Award Plaintiff the out of pocket costs and consequential damages she incurred as a result of Defendant's discrimination against her;

E.  Award Ms. Cosmann reasonable attorneys' fees and the costs of this litigation, including the fees and costs incurred in the EEOC administrative process;

F.  Award Ms. Cosmann such front pay and future benefits as may be appropriate;

G.  Enjoin Defendant from discriminating against, retaliating against, or harassing her in any manner;

H.  Award Ms. Cosmann appropriate prejudgment and post-judgment interest;

I.  Award Plaintiff an addition amount to account for any taxes she may be called upon to pay in relation to these awards herein;

J.  Order Defendant to develop and implement effective measures to ensure that individuals with disabilities are given appropriate accommodations and are not discriminated against or retaliated against;

K.  Order Defendant to consider appropriate disciplinary actions against the management officials who engaged in discrimination and/or retaliation against Plaintiff;

L.  Posting of notices on Defendant's premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation; and

M.  Award such other relief as may be necessary and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues of triable fact in the foregoing complaint.

DATE:  August 15, 2022

Respectfully submitted,

/s/ Lenore C. Garon
Lenore C. Garon (VA Bar # 39934)
LAW OFFICE OF LENORE C. GARON,
PLLC
2412 Falls Place Court
Falls Church, Virginia 22043
Phone: 703-534-6662
Fax: 703-534-4448
lenore@lenorecgaron.com
*Counsel for Plaintiff*

   /S/ MICHAL SHINNAR
Michal Shinnar, Esq.
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
301.220.2200 (T)
301.220.1214 (F)
mshinnar@jgllaw.com
*Counsel for Plaintiff*
*pro hac vice forthcoming*

   /S/ JAY HOLLAND
Jay P. Holland, Esq.
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
301.220.2200 (T)
301.220.1214 (F)
jholland@jgllaw.com
*Counsel for Plaintiff*
*pro hac vice forthcoming*