**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **DEIRDRE N. COSMANN,**<br><br>*Plaintiff*,<br><br>v.<br><br>**BOOZ ALLEN HAMILTON, INC.,**<br><br>*Defendant*. | Case No.: 1:22-CV-00933-PTG |

**EXHIBIT 1 – DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| **DEIRDRE N. COSMANN,**<br><br>*Plaintiff*,<br><br>v.<br><br>**BOOZ ALLEN HAMILTON, INC.,**<br><br>*Defendant.* | Case No.: 1:22-CV-00933-PTG |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56(B), Defendant Booz Allen Hamilton Inc. ("Booz Allen" or "Defendant") respectfully submits this Statement of Undisputed Material Facts in support of Defendant's Motion for Summary Judgment and Defendant's Memorandum of Law In Support of Its Motion for Summary Judgment.

/s/ James J. Murphy
Ajente Kamalanathan, VA Bar No. 92326
Gary D. Eisenstat (admitted *Pro Hac Vice*)
James J. Murphy (admitted *Pro Hac Vice*)
1909 K Street, NW, Suite 1000
Washington, DC 20006
Telephone:  (202) 263.0260
Facsimile:   (202) 887.0866
Email:  james.murphy@ogletree.com
Email:  ajente.kamalanathan@ogletree.com

*Counsel for Defendant*

**Introduction**

1. Plaintiff commenced employment with Booz Allen in April 2007 as a Senior Consultant and had advanced to Associate by the time of the events described in the Complaint. **ECF No. 34, Stipulation of Uncontested Facts, ("ECF No. 34"), ¶ 1**. Plaintiff worked in billable, customer-facing positions. **Exh. 8, (hereinafter "Ex. 8 (Cosmann)"), 71:17-20**.

2. During the relevant period, Booz Allen maintained an *Equal Employment Opportunity* policy ("EEO policy") stating its policy to provide reasonable accommodations to applicants or employees with a disability to enable them to perform the essential functions of their jobs. **Exh. 7, Cower Decl., (hereinafter, "Ex. 7 (Cower)") ¶ 3, Attach. A**. The policy advised employees to make requests for reasonable accommodations by contacting Human Resources or the Disabilities Accommodation Team. *Id.* The EEO policy stated that allegations of a policy violation would be investigated and referenced the firm's *Non-Retaliation* policy as well as its *Cooperating with Investigations* policy, which prohibited retaliation against employees who participate in investigations at Booz Allen. *Id.*, **¶¶ 5-6, Attach. C, D**.

3. During the relevant period, Booz Allen maintained a *Work Arrangements* policy that recognized three types of worksites for employees – Client-Site, Non-client Site, and Telework - and set requirements for employees to follow when teleworking. *Id.*, **¶ 4, Attach. B**.

4. With respect to recruiting, Booz Allen maintained and followed a policy of hiring the best qualified candidate for each position. This policy was set forth in Booz Allen's Recruiting, Hiring and Employee Referral policy. *Id.*, **¶ 10, Attach. H**.

5. Booz Allen also maintained a "Lack of Work" policy and practice applicable to employees for whom no work was available, a status that was known among Booz Allen employees as being "on the bench" - a phrase used at Booz Allen to refer to the status of billable employees who no

longer have billable work to perform and are in search of a new position that matches their skills and abilities. *Id.*, ¶ 11. Although the duration of an employee's time "on the bench" was not dictated by policy, Booz Allen's practice was to issue a "Lack of Work" letter to employees on the bench who were unable to locate work. *Id.*, ¶ 13. The letter notified the employee of their termination date with a notice period of two-to-four weeks per Booz Allen's *Separation of Employment Policy*. *Id.*, ¶ 13, Attach. F. Booz Allen's practice was to rescind a Lack-of-Work letter if the employee secured a billable position that would last for longer than 90 days. *Id.*, ¶ 13. Booz Allen maintained a practice of not issuing a Lack-of-Work letter to an employee on a leave of absence or while an investigation of a complaint they made was pending. *Id.*, ¶ 15.

6. Beginning in 2013, Plaintiff sought and requested several workplace accommodations relating to her migraine condition. **Ex. 8 (Cosmann), 42:9-13; 52:2-4.** The accommodations included telework so Plaintiff could manage migraine flare-ups, as well as a flexible schedule for medical appointments, an ergonomic chair to relieve pressure on Plaintiff's back and neck, a computer screen filter to reduce glare, and a reserved private office so Plaintiff could control noise and lighting. *Id.*, **42:14-16; 44:11-16; 45:10-18; 47:3-14; 48:12-19.**

7. On or about May 2, 2019, Plaintiff was placed on the bench due to a lack of work on a transportation program for the Marine Corps Installation Command. **Ex. 8 (Cosmann), 92:20-93:11; 94:2-16, Depo. Ex. 6**. She was issued a Lack-of-Work letter on May 24, 2019, giving her four weeks' notice of termination. *Id.*, **97:4-21, Depo. Ex. 8.** Booz Allen rescinded Plaintiff's Lack-of-Work letter on June 21, 2019 when she secured a position on Booz Allen's contract to support the Army's Office of Energy Initiatives ("OEI"). *Id.*, **99:12-22; 100:1-4.**

8. Plaintiff worked on the OEI contract from mid-July 2019 through December 13, 2019. **ECF No. 34, ¶¶ 5; 9**. Employees on the contract were allowed to telework "at the government's

3

discretion and on an individual basis," provided that Booz Allen submitted a copy of its Time and Telework Policy to the contracting officer to keep on file. **Exh. 5, Crunkilton Decl., (hereinafter "Ex. 5 (Crunkilton)") ¶¶ 5-6, Attach. A, B**.

9. While on the OEI contract, Plaintiff requested reasonable accommodations that included telework to help manage her migraine condition. **ECF No. 34, ¶ 6**. On or about November 21, 2019, Booz Allen's Disabilities & Accommodations Team issued and finalized with Plaintiff's managers an approved accommodation for Plaintiff's migraine condition permitting her to telework for up to eight full or partial days a month. **Ex. 8 (Cosmann), 60:11-16; 62:15-64, Depo. Ex. 3; Ex. 5 (Crunkilton), ¶ 8.**

### Plaintiff's Departure from the OEI Contract

10. On December 5, 2019, the OEI Program Manager, Mr. John Crunkilton, and Plaintiff had a one-on-one meeting, during which Plaintiff informed Mr. Crunkilton that she thought it was best that she leave the OEI contract. **Ex. 5 (Crunkilton), ¶¶ 9-10, Attach. C.** In an e-mail to confirm their conversation that same day, Mr. Crunkilton asked Plaintiff to confirm she wanted to transition off the contract due to health conditions that prevented her from being able to effectively accomplish the prescribed work and support the team. **Id., ¶ 11, Attach. D**. Plaintiff responded that Mr. Crunkilton had captured the conversation correctly. **Id.** She added, "I think it's in the best interest of Lacey, a great colleague and [Project Manager], to have someone who has the capacity to give 100 percent. Unfortunately, at this juncture, I'm not able to and it's creating stress." **Id.** On December 6, 2019, in an e-mail exchange with her career coach, Plaintiff characterized her decision to leave the OEI contract as a "mutual agreement" with Mr. Crunkilton that the assignment on the OEI contract was not the best fit for her. **Ex. 8 (Cosmann), 150:4-11, Depo. Ex. 16**. Plaintiff previously had admitted that it was apparent she was "not capable of working at

100% capacity" and was "falling short on [her] billable hour targets." **Ex. 8 (Cosmann), 125:4-22; 126:1-6, Depo. Ex. 12.**

11. December 13, 2019 was Plaintiff's last day on the OEI contract. **ECF No. 34, ¶ 9**. On December 10, 2019, her HR representative informed her she would be "on the bench" beginning on December 16, 2020. **Exh. 9, Plf. Responses to Def. Request for Admissions, Request No. 5**. From this point through her termination date, Plaintiff's home was her primary work location, and she was not assigned any billable work to perform. **Ex. 8 (Cosmann), 68:3-5; 70:8-71:20.** She was free to telework during this entire time period. *Id.*

### Plaintiff's Internal Job Search

12. During the Claims Period, and the period leading up to the Claims Period, Booz Allen provided employees who were "on the bench" with a robust set of resources to assist them identify new opportunities that matched their skills, abilities, and interests. **Exh. 4, Putrino Decl., (hereinafter "Ex. 4 (Putrino)"), ¶¶ 3-6.** The two primary resources that Booz Allen provides to employees who are "on the bench" are the job postings and "Open Requisitions Report" found on Booz Allen's Workday® platform, and "the Accelerator," an internal job resource that Booz Allen developed to assist employees to locate current or future opportunities within the company. *Id.* Participants who registered for Accelerator automatically received "Job Opportunity Digest" alerts from accelerator@bah.com multiple times each week. *Id.*, **¶ 11, Attach. B**. These resources provided employees with job search tools, timely notice of new opportunities, and access to all job requisitions posted on Workday® and all internal opportunities posted in Accelerator. *Id.*

13. The orientation materials for Accelerator discussed how to apply for positions. **Ex. 7 (Cower) ¶ 7, Attach. E1.** They stressed that "You must apply through Workday® if the

opportunity is listed there, per firm policy (you don't have to apply through Workday® for Gig Work nor for most of the positions on our Featured Opportunities page."). *Id.*

14. At the outset of Plaintiff's job search, Booz Allen Principal Scott Thigpen agreed to become her Career Manager and to provide executive-level support to help her find billable work. **Exh. 2, Thigpen Decl., (hereinafter "Ex. 2 (Thigpen)"), ¶ 3**. He set up a standing schedule of 15-minute one-on-one "tag up" meetings for Plaintiff and him to speak every other day to ensure she was making progress and that he was helping in any way he could. *Id.* **at 9**. He encouraged Plaintiff to cast a wide net for job opportunities and to let him know where he could be of use. **Ex. 2 (Thigpen) ¶ 4.**

15. During her job search, one obstacle Plaintiff encountered was that, for a number of the positions she found, Booz Allen's salary, overhead, and other costs to employ her (also known as her "burdened rate") exceeded the reimbursement rates customers would pay Booz Allen for services performed by the person in the position. **Ex. 2 (Thigpen), ¶ 23**. In February 2020, Mr. Thigpen informed Plaintiff that her burdened rate was approximately $121.00 an hour ($148.00 if the services were performed from Booz Allen offices). *Id.***, ¶ 25, Attach. G**.

16. By the middle of March 2020, Plaintiff was approaching three months without securing a billable contract position. *Id.***, ¶ 6**. Mr. Thigpen initiated the process for issuing her a Lack-of-Work letter, which was issued on March 23, 2020, notifying Plaintiff that her employment would terminate on April 21, 2020 if she did not secure billable work for a specified duration before that date. *Id.*

17. Effective March 17, 2020, Booz Allen adopted a mandatory telework policy that applied to all employees who were in a non-billable status, who worked at Booz Allen locations, and who worked at customer locations that permitted telework to perform. **Ex. 7 (Cower) ¶ 9, Attach. G**.

These employees were prohibited from entering the workplace absent specific approval and were required to perform any work-related activities via telework. *Id.*

## The Claims Period (March 22, 2020 Forward)

18. Even after Plaintiff's Lack-of-Work letter was issued, Booz Allen supported her job search, and Mr. Thigpen and Plaintiff continued to hold their tag-up meetings. **Ex. 2 (Thigpen), ¶ 9.**

19. On March 26, 2020, an Accelerator Agent, Sofia Putrino, sent Plaintiff an email with a suggested list of opportunities matching Plaintiff's location, clearance level, and job family. **Ex. 4 (Putrino), ¶ 10, Attach. A.** Ms. Putrino offered Plaintiff additional recommendations and asked that she please "cc" her when applying to any roles or reaching out to any Hiring Managers. *Id.*, **at ¶ 13, Attach. C.** Plaintiff reached out to Ms. Putrino only once, and that was merely for contact information for a hiring manager. *Id.*, **at ¶ 14, Attach. D**.

20. On April 1, 2020 Booz Allen announced a no-termination policy in response to the COVID-19 pandemic, to provide job security for certain employees through June 30, 2020. **Ex. 7 (Cower), ¶ 16.** The policy was not applied to employees who experienced a lack of work for reasons other than the COVID-19 pandemic. *Id.* Plaintiff is not aware of any other employee who received a Lack-of-Work letter for a reason unrelated to COVID-19 who benefitted from the no-termination policy. **Ex. 8 (Cosmann), 306:5-307:1.**

21. Between April 1, 2020 and June 30, 2020 Booz Allen terminated at least 30 employees due to a lack of work caused by reasons other than COVID-19. **Exh. 3, Duncan Decl., (hereinafter "Ex. 3 (Duncan)"), ¶ 3, Attach. A.** Plaintiff was among 13 other employees terminated in April, while eight were terminated in May, and nine in June. *Id.* Plaintiff was among five who were Associates. *Id.* Aside from Plaintiff, only one other individual among the 30 employees had sought accommodations from the Accommodations Team. *Id.*

22. On or about April 15, 2020, Mr. Thigpen and HR Business Partner Rachel Guajardo-Lopez participated in a telephone call (actually, in Mr. Thigpen's case, two calls) that Plaintiff tape-recorded using an application on her smartphone without the knowledge or consent of Mr. Thigpen or Ms. Guajardo-Lopez. **Ex. 8 (Cosmann), 235:22-236:19; 238:16-22.** True and correct copies of the transcripts of those calls were identified as exhibits at Plaintiff's deposition. *Id.,* **240:17-21, Depo. Ex. 28; 246:16-19, Depo. Ex. 29.**

23. On April 17, 2020, Mr. Thigpen sent out a blast e-mail to a long distribution list of BAH colleagues to "make one last push to see if we can find a role for Nicole Cosmann." **Ex. 2 (Thigpen) at ¶ 11, Attach. B.** Mr. Thigpen mentioned Plaintiff's areas of experience and asked people to let him know if they had billable contract work for her. *Id.*

24. On April 16, when Plaintiff told Mr. Thigpen she had not heard back from Hiring Manager Argyro Kavvada about two contingent requisitions she was interested in (Remote Sensing Expert, Senior - R0080693 and R80671), Mr. Thigpen introduced himself to the Hiring Manager's boss, Eric Boulware, and asked him to consider Plaintiff for the position. *Id.***, at ¶ 12, Attach. C.**

25. Plaintiff attempted to contact the Hiring Manager and Recruiter for a Military Mission Capacity Analyst requisition on or about April 17. (Plaintiff also e-mailed Ms. Putrino on April 19, 2020, asking her for assistance getting in touch with them.) **Ex. 4 (Putrino), ¶ 14, Attach. D**. Mr. Thigpen e-mailed the Hiring Manager on April 20, 2020, to introduce himself and encouraged him to consider Plaintiff. **Ex. 2 (Thigpen), ¶ 13, Attach. D**.

26. When Plaintiff had not heard back from Hiring Manager Kim Donovan about a Dashboard Developer role for Booz Allen's ADVANA project, Mr. Thigpen e-mailed Ms. Donovan and asked her to consider Plaintiff, as her termination date was approaching. *Id.***, ¶ 14, Attach. 4**. However, the inquiries to Ms. Donovan coincided with an overwhelming workload she faced supporting a

8

Coronavirus task force for the Department of Defense. **Exh. 6, Donovan Decl., (hereinafter "Ex. 6 (Donovan)") ¶ 3.** She was unable to review or consider Plaintiff's inquiries prior to Plaintiff's termination date. *Id.*, **¶ 7**. Since then, however, she concluded that Plaintiff did not have the experience or the technical skills that these roles required. *Id.*, **at 8**. Plaintiff's resume does not reflect actual experience using Qliksense or Tableau, which were key skills. **Ex. 8 (Cosmann), 24:12-22, Depo. Ex. 1.**

27. For the period of December 16, 2019 through April 21, 2020, Booz Allen's Workday® platform has no record of Plaintiff applying for any position other than Military Mission Capacity Analyst. **Ex. 4 (Putrino), ¶ 16, Attach. E, F**. She applied for that position on April 20, 2020. *Id.* This requisition subsequently was closed without any candidate being hired to fill it. *Id.* The reason recorded in Workday® stated, "*No longer recruiting; position no longer needed.*"[1] *Id.*

28. Plaintiff received her full salary and benefits from December 16, 2019 through her termination date, which was April 21, 2020. **Ex. 8 (Cosmann), 161:18-162:3.**

Breakdown of Workday Requisitions

29. In the course of discovery, Defendant searched the requisitions posted in Workday® and identified a number of positions relevant to Plaintiff's areas of expertise – energy, environment, sustainability, transportation, mobility, and military installations meeting relevancy parameters. The details of these requisitions were extracted from Workday® and are contained in the Declaration of Elizabeth Duncan. **Ex. 3 (Duncan), ¶¶ 8-35, & Schedule A**. Plaintiff did not apply

---

[1] Booz Allen's Workday® system shows that, aside from the requisition for the Military Mission Capacity Analyst position, there was only one requisition Plaintiff applied for on Booz Allen's Workday® platform. She applied for Requisition R059680, Energy Research and Development Project Management Analyst, on or about June 17, 2019. *Id.*, **¶ 17, Attach. G.**

for or contact the Hiring Manager to express interest in any of following six requisitions, each of which was open during the Claims Period and was filled by a candidate other than the Plaintiff:

| Requisition No. | Position Name |
|---|---|
| R79677 | Transportation Specialist, Mid |
| R81593 | Energy Contract Specialist & Procurement Analyst |
| 076625 | Energy Contract Specialist & Procurement Analyst |
| R79793 | Energy Res & Dev. Project Mgmt. Analyst |
| R82003 | Energy Technology Res. & Dev. Analyst, Sr. |
| R81197 | F-35 Systems Safety Engineer |

30. Four of the requisitions were closed or filled before the Claims Period. They were Energy Research and Development Project Management Analysts (R75555 and R77816), for which candidates were hired on Feb. 24, 2020 and March 2, 2020; Environmental Specialist (R79612), which was closed on March 17, 2020; and Energy Project Manager (R76764), which was closed on March 4, 2020. The latter two were closed without a hire being selected. *Id.*, ¶¶ **17, 19, 20, 24**.

31. Each of the following requisitions was closed on or after March 22, 2020 without any candidate ever being selected to fill them.

| Requisition No. | Position Name |
|---|---|
| R79047 | Military Mission Capacity Analyst* |
| R76407 | Installation Energy Resilience Analyst* |
| R76603 | Energy Performance Analyst* |
| R75822 | Energy Project Manager, Mid* |
| R80671 | Remote Sensing Expert* |
| R80693 | Remote Sensing Expert, Sr.* |
| R80811 | Stakeholder Engagement Expert, Sr. |
| R75552 | Energy Engineer, Mid* |
| R79612 | Environmental Specialist |
| R79677 | Transportation Specialist |
| R80339 | Environmental Specialist, Jr. |
| R80663 | Directed Energy Operations Specialist |
| R78865 | Transportation Specialist |
| R80971 | Air Traffic Control Specialist |
| R81892 | Mobility Capability Lead |
| R81885 | Mobility Engineer |
| R82283 | Mobility Engineer |
| R82284 | Mobility Engineer |

10

| | |
|---|---|
| R80288 | Next Generation Desktop Envt Virtual Desktop Initiative Engineer |
| R76712 | Senior Solutions Architect |

32. Plaintiff did not apply for or contact the hiring manager to express interest in any of the requisitions on the preceding list, except for the 7 requisitions identified with an asterisk. *Id.*, ¶¶ **8; 9; 10; 14; 12; 11; 16**.

33. Scott Thigpen has been identified as the Hiring Manager at one time or another for four requisitions. Two of these requisitions—Installation Energy Resilience Analyst (R076407) and Energy Performance Analyst (R076603)—required a Top Secret clearance plus 20+ years of experience, whereas Plaintiff possessed only a "Secret" level of security clearance and had accumulated only about 15 years of experience. *Id.*, ¶¶ **9-10**. Both of these requisitions were identified as "contingent" and were closed without any candidate being hired or selected to fill them. *Id.*

34. Mr. Thigpen also listed as the Hiring Manager for Energy Engineer, Mid (R075552), which was classified as a contingent requisition and then closed without any candidate being selected to fill the position, which required an electrical or mechanical engineering degree. *Id.*, ¶ **16 & Schedule A.**

35. The actual Workday® posting for Energy Project Manager, Mid (R075822) identified Elise Audrain as the Hiring Manager– though more recent data from Workday® identify Mr. Thigpen as the Hiring Manager. Plaintiff has no recollection of contacting the Hiring Manager, Elise Audrain, or the Recruiter, Shelby Lancaster to express interest in the position. **Ex. 8 (Cosmann), 224:5-19; 211:1-16, Depo. Ex. 25.**

36. Plaintiff has no knowledge that Mr. Thigpen told any Hiring Manager or Recruiter that Plaintiff had made accommodation requests, that she complained about an accommodation, or that she could only perform jobs that were 100% remote. She has no knowledge that Mr. Thigpen or

11

other Booz Allen managers ever discouraged a Hiring Manager from considering her for an opportunity or that he told them not to hire Plaintiff because she needed an accommodation. **Ex. 8 (Cosmann) 193:15-196:11; 250:20-253:5.**